# Exhibit 1

# THE LARUSSO LAW FIRM



ROBERT P. LARUSSO, ESQ.
robert@rlarussolaw.com

July 17, 2024

<u>**Electronically Filed Under Seal**</u>

The Honorable Judge Dora Lizette Irizarry
U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:    United States v. Quandelle Joseph
              <u>Criminal Docket No. 23-cr-306 (DLI)</u>

Dear Judge Irizarry:

    Quandelle Joseph ("Joseph") is a non-violent, first-time offender, without any criminal record, and a person devoted to his family, girlfriend Tanashia Frazier, son King Joseph (age 7) and his stepdaughter, Amani Ritter (age 14), whom he has raised with her mother since the child was 3 years old. Mr. Joseph has worked almost his entire life, except during a period when he successfully battled cancer. (See, PSR ¶ 72) ("From May 2013 until July 2014, the defendant was unemployed; he was receiving chemotherapy treatments and was financially supported through social security disability income (SSDI)"; see also, PSR ¶ 63-64).

    In early 2020, his family decided to move to Atlanta, Georgia. Mr. Joseph began work as a correction officer on May 26, 2020, for the Federal Bureau of Prisons ("BOP") at the Metropolitan Detention Center ("MDC"), and planned on seeking a transfer to Atlanta ████████where his fiancée, a retired veteran, was employed as a drug treatment counselor. During his employment at the MDC, Mr. Joseph made the worst mistake of his life, receiving money to bring contraband into

666 Old Country Road – Suite 501 – Garden City, New York 11530
Telephone: 516-248-3520 ◆ Facsimile: 516-683-8410

the prison. He has accepted responsibility for his conduct, and, since his arrest, has tried to prove to his family and the Court that he deserves a second chance by fully complying with the conditions of release, trying to meet his family responsibilities by traveling to Atlanta, as often as possible, usually several times a month, and seeking meaningful employment that is made extremely difficult in the face of an open criminal case.

We submit that a non-guideline and non-custodial sentence is "sufficient, but not greater than necessary" to satisfy the goals of a fair and just punishment for the offense, general and specific deterrence, and rehabilitation. Mr. Joseph is a non-violent, first-time offender, who, since his arrest, has committed himself to rehabilitation, by complying with all the restrictive conditions of supervised release, by continuing to provide financial and emotional support for his children, and by maintaining employment. Character letters from family members and friends speak of his good character, provide support for our position that Mr. Joseph has accepted responsibility for his actions, is committed to rehabilitation, and poses no danger of repeating his misconduct.

For the reasons presented hereafter, we respectfully request that the Court consider a non-custodial sentence that would permit Mr. Joseph to continue his efforts at rehabilitation and, at the same time, fulfill his family obligations raising his children.

There are two other factors that we respectfully ask the Court to consider in determining an appropriate sentence. First, the recent guideline amendments favor a non-custodial sentence for a first-time, non-violent offender like Mr. Joseph, and second, a non-incarceratory sentence is warranted for Mr. Joseph to avoid a sentence disparity with a similar bribery case where a defendant, also a correction officer at the MDC, received a probationary sentence with a period of home confinement and community service, for smuggling contraband into the MDC.

1.  **The Sentencing Guidelines.**

The PSR calculated Mr. Joseph's total offense level at 19, which included a 4-point adjustment alleging that the defendant was "a public official in a sensitive position," resulting in a guideline range of 30 to 37 months in Criminal History Category I. (See, PSR ¶14 to 25, and ¶ 84). At his plea, Mr. Joseph's attorney advised the Court that the defendant was challenging the "public official" enhancement, and, therefore, the total offense level should be 15 and the appropriate guideline range is 18 to 24 months. (See, January 11, 2024 Minute Entry in the captioned case). However, regardless of the sentencing range, we submit that, after a consideration of all the 3553(a) factors, a non-custodial sentence is "sufficient" to satisfy the goals of sentencing, especially considering the recent Guideline amendments for zero-point offenders that recognize "[a] departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1(Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." (See, Application Note 10(B) of U.S.S.G. § 5C1.2).

Mr. Joseph has no prior criminal record and is a "zero-point offender" whose crime of bribery, while admittedly serious, did not involve violence or the smuggling of weapons into the prison or other serious contraband. In its letter dated April 24, 2024, to the U.S. Probation Department, the Government alleged that the evidence revealed that Mr. Joseph smuggled "marijuana, other narcotics, cigarettes and a cell phone for Inmate-3" and, on another occasion discussed "glasses that were forgotten can be brought in 'next time.'" (See, Government April 24, 2024 Letter attached as **Exhibit 1**).

### a. U.S.S.G. ¶ 2C1.1(b)(3) Enhancement for being a Public Official in a Sensitive Position is inapplicable to Mr. Joseph, a federal correction officer.

According to the relevant portion of § 2C1.1(b)(3), a four-point enhancement is warranted "[i]f the offense involved . . . any public official in a high-level decision-making or sensitive position." A non-supervisory correction officer like Mr. Joseph is certainly not a high-level decision maker. Probation applied a four-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(3) because Mr. Joseph, as a federal correction officer, "was a public official in a sensitive position." (See, PSR ¶ 17). We concede that Mr. Joseph was a "public official" but contest the finding that he held a "sensitive position" warranting the enhancement.

Application Note 4(A) defines a "sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." Examples of a "public official who holds a sensitive position...include a juror, a law enforcement officer, an elected official and any other similarly situated individual." (See, U.S.S.G. § 2C1.1(b)(3), Application Note 4B). As a non-supervisory correction officer, Mr. Joseph did not hold a sensitive position.

Mr. Joseph, as a correction officer, had the right to carry firearms and the authority to make arrests for crimes committed in his presence and to enforce the Bureau of Prisons ("BOP") rules and regulations, but his powers were certainly narrower than those of supervisory correction officers, officers assigned to the Special Investigative Supervisor ("SIS") in the prison[1], and even law enforcement officers. He certainly did not have the "direct authority" to make decisions for

---

[1] SIS investigates criminal activity by inmates and prison staff and reports directly to the warden for a decision to refer a matter for criminal prosecution or for internal adjudication and punishment for violations of BOP rules and regulations.

the BOP nor have "substantial influence over any decision-making process." The level of decision-making authority is narrower and more limited than that of his supervisors, SIS personnel and even members of law enforcement. Correction Officers follow rigid rules and regulations controlling the operations in the prison, with minimal to non-existent discretion in its enforcement. The lack of decision-making authority precludes application of the enhancement.

We recognize that several circuits have already ruled against our position. See, *United States v. Zamora*,982 F.3d 1080, 1085-86 (7th Cir. 2020); *United States v. Grosso*, 658 F. App'x 43, 46-47 (3d Cir. 2016); *United States v. Dodd*, 770 F.3d 306, 312 (4th Cir. 2014); *United States v. Guzman*, 781 F. App'x 493, 494-95 (5th Cir. 2011); *United States v. Castillo* Chairez, 423 F. App'x 361, 362 (5th Cir. 2011); and, United *States v. Griffith* 781 F. App'x418, 421 (6th Cir. 2019). These opinions vary on the standards applied to reach the decisions, including comparing a guard to a law enforcement officer (*Griffith,* 781 F. App'x at 421), noting that a correction officer "wields the coercive power of the state to maintain order and safety among the populations he protects. This power places him in a sensitive position because correction officers who accept bribes to bring contraband to prisoners endanger those inside and outside of the prison" (see, *United States v. Gross*, 658 F. App'x at 46-47; see also, *United States v Zamora*, 982 F. 3d at 1085-86)(recognizing "that § 2C1.1 probably calls for some level of decision-making authority on the part of an official deemed to have a "sensitive position," the Court nonetheless ruled that "prison guards are situated similarly to law enforcement officers for purposes of § 2C1.1(b)(3) as explained in Application Note 4(B). 'The men and women who occupy these positions wield the coercive power of the state to maintain order and safety among the populations they protect. They are responsible for enforcing the rules.'").

A district court refused to apply the four-level enhancement noting that, regarding the argument that a correction officer was in a sensitive position because of the ability to impact the safety of the facility, "any position inside the facility could be considered 'sensitive.' Cooks, nurses, and custodians all have the same ability to influence facility safety by smuggling contraband. . . there are nearly 300 fulltime security staff at [the jail]. Surely, they all are not 'high-level decision makers.'" *United States v. Henderson*, 465 F. Supp. 3d 77, 7789-80 (N.D. OH 2020).

Notably, the Second Circuit has not ruled on the issue, and, in the absence of an appropriate and reliable standard to evaluate the issue, we submit that the Court should decline to apply the four-level enhancement because correction officers, like Mr. Joseph, are not "high-level decision makers" or even have the "substantial influence over the decision-making process" required for the enhancement.

### b. Recent Guideline Amendment §5C1.1 supports a non-custodial sentence for Mr. Joseph who is a non-violent, zero-point offender.

U.S.S.G. §5C1.1, Application Note 10(B) reads, "[a] departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." Mr. Joseph is a zero-point, first-time offender, and, as a result, received a two-point downward adjustment under guideline §4C1.1. (See, PSR ¶22). Furthermore, the crime of bribery is "not a crime of violence," and, though smuggling contraband is a serious offense, the contraband brought into the prison by bribing Mr. Joseph involved cell phones, marijuana, and "glasses" belonging to Inmate-3, and not more serious contraband such as weapons.

We are not seeking to minimize the seriousness of the offense of bribery or smuggling contraband into a prison, but we believe the nature of the contraband brought into the prison by Mr. Joseph was certainly less serious than receiving bribes to smuggle weapons into the MDC.

## 2. A Sentence Below the Recommended Guideline Range is Appropriate after Careful Evaluation of 3553(a) Factors.

As the Court is aware, *United States v. Booker*, 543 U.S. 220 (2005) restored district courts' ability to fashion a sentence tailored to the individual circumstances of the case by requiring courts to consider all the factors set forth in Title 18, U.S.C Section 3553(a). Indeed, under Title 18 U.S.C. § 3553(a) courts are required to sentence below the range if such a sentence would be sufficient to achieve the purpose of punishment.

Following up on their decision in *Booker*, the Supreme Court in *Gall v. United States*, 552 U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85(2007), effectively reaffirmed the district court's broad sentencing discretion by permitting them to impose a sentence after considering "all" the §3553(a) factors, with the Guidelines being only one such consideration. *United States v. Jones*, 531 F.3d 163, 174-75 (2d Cir. 2008); *United States v. Booker*, 543 U.S. at 245-46; *United States v. Crosby*, 397 F.3d 103, 112-14; see also, 18 U.S.C. §3553(a). Any attempt to give special weight to the Guideline ranges would be contrary to *Booker* which ruled the Guidelines advisory.

The sentencing guidelines are only the "starting-point and the initial benchmark." *Kimbrough v. United States*, 552 U.S. at 108 (citing, *Gall v. United States*, 552 U.S. at 39). The Court "may not presume that the Guideline range is reasonable." *Gall v. United States*, 552 U.S. at 50 (citing, *United States v. Rita*, 551 U.S. 338, 357-58 (2007)); see also, *Nelson v. United States*, 555 U.S. 350, 352 (2009)("The guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); see also, *Dillon v. United States*, 560 U.S. 817, 841

(2010)(A "sentencing court may not presume [the Guidelines] correct or reasonable when it considers an individual sentencing decision."). Nor should the sentencing court presume a non-guideline sentence "unreasonable." *Irizarry v. United States*, 128 S. Ct. 2198, 2201-02 (2008).

Rather, the sentencing court must make an individualized assessment based upon the facts presented after full consideration of all the § 3553(a) factors. *Gall v. United States*, 552 U.S. at 44, 49-50. The Court may, "in the particular case [determine that] a within-Guideline sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough v. United States*, 552 U.S. at 91 (citing, 18 U.S.C. § 3553(a)) "While a sentencing Court is statutorily obligated to give fair consideration to the guideline before imposing sentence, in the end, it must make an individualized assessment of the sentence warranted by Section 3553(a) based on facts presented." *United States v. Jones*, 531 F.3d at 170; see also, *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008)(A sentencing court "has a wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.").

In exercising discretion, a sentencing judge "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008)(en banc). District judges are "generally free to impose sentences outside the recommended range" and an appellate court "will not substitute our judgment for the district courts on the question of what is sufficient to meet the §3553(a) considerations in any particular case." *United States v. Cavera*, 550 F.3d at 188.

Ultimately, the district court is guided by the requirement to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553(a)(2).

Among the sentencing factors in 18 U.S.C. § 3553, that a court must consider, are (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; and

(3) the need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, and (C) to protect the public from further crimes of the defendant.

Based upon the "individualized assessment" of the facts presented herein and after consideration of all the factors detailed in § 3553(a), we respectfully submit that a time-served sentence below the recommended guideline range is an appropriate and reasonable sentence for the defendant and is sufficient but not greater than necessary to satisfy the purposes and goals of sentencing.

### 3. Nature of the Offense.

On January 11, 2024, Mr. Joseph pled guilty to Count 4 of the Indictment, admitting that between January 2021 and November 2021, he accepted and agreed to receive money to bring contraband into the Metropolitan Detention Center ("MDC") while employed as a correction officer with the Bureau of Prisons. By pleading guilty, Mr. Joseph accepted responsibility for his crimes, expressed sincere remorse for his offenses, and has committed himself to rehabilitation.

The PSR mistakenly reported that Mr. Joseph smuggled marijuana and a cell phone to Inmate-1 hidden inside a blanket on December 5, 2020. (See, PSR ¶ 8). The person responsible for the December 5, 2020 incident was another correction guard Jeremy Monk who was convicted of the offense, and sentenced on December 6, 2023 by the Honorable Frederic Block to a one-year term of probation, 3 months home confinement, and 50 hours of community service. (See, Judgment in a Criminal Case, Criminal Docket No. 22-442(FB) filed as Document 23 and attached as **Exhibit 2**).

In its sentencing memorandum submitted in the case of *United States v. Jeremy Monk*, the Government noted that "[w]ithin months of joining the BOP" in May 2020, the same month Mr.

Joseph began working at the MDC, Jeremy Monk "accepted bribes on multiple occasions in exchange for smuggling contraband into the MDC." (See, page 1 of Government December 1, 2023 Sentence Memorandum filed as Document 21 in *United States v. Jeremy Monk*, Criminal Docket 22-442(FB) attached as **Exhibit 3**). As an example of Jeremy Monk's smuggling activity, the Government represented that, "on December 5, 2020, MDC staff conducted a search of an inmate's cell ("Inmate 1") because an officer smelled marijuana emanating from his cell. Although no marijuana was found, MDC staff recovered a contraband cell phone from Inmate-1's cell. Financial records show that an associate of Inmate-1 attempted to make seven payments in amounts ranging from $750 to $4,000 to [Jeremy Monk] via Cash App in the days prior to this search, but Cash App blocked all the payments." (See, page 2 of **Exhibit 3**).

In our case, the Government has incorrectly inferred from a series of facts that Mr. Joseph delivered the contraband cell phone to Inmate-1 on December 5, 2020, the same contraband that Jeremy Monk took responsibility for smuggling to Inmate-1 by pleading guilty and receiving a non-custodial sentence.

The Government correctly reported that Mr. Joseph was seen on video delivering a bedroll on December 5, 2020, to Inmate-1's cell in a different housing unit than the one Mr. Joseph was assigned to that day. In addition, because "bedrolls, consisting of sheets, blankets, and other hygiene items," are "typically provided to an inmate when they arrive at the facility," and because "Inmate-1 was not in the defendant's unit, and there was a lockdown at the time," the Government assumed that "there was absolutely no reason for the defendant to open Inmate-1's cell and bring him a bedroll," accept to deliver the contraband cell that was recovered "[a]pproximately four hours later on December 5, 2020," by "MDC staff conduct[ing] a search of Inmate-1's cell because an officer smelled marijuana emanating from it." (See, pages 1-2 of **Exhibit 3**).

At this point the Government provided the only direct and credible evidence linking Mr. Joseph to the contraband cell phone recovered on December 5, 2020, by pointing out that "[t]ext messages between the defendant and an Inmate-1's associate showed that in January 2021, the defendant requested $12,000 as payment for smuggling contraband to Inmate-1." (See, page 2 of **Exhibit 3**). However, this statement is misleading and had nothing to do with the contraband Inmate-1 received on December 5, 2020.

First, my client was delivering a bedroll that was, according to a female officer assigned to Inmate-1's housing unit, requested by Inmate-1, and even before delivering the bedroll, Mr. Joseph was advised that she smelled marijuana in Inmate-1's cell and that she was going to report the facts we assume to her supervisor or SIS Officer. We submit that it is unreasonable to believe that my client would deliver contraband knowing (1) that a search of Inmate-1's cell was certain to occur; and (2) that video surveillance cameras in the housing units would record Mr. Joseph delivering the bedroll to Inmate-1's cell.

More significantly, the text messages were in January 2021, more than a month after the December 5, 2020, incident. My client acknowledges that, at Jeremey Monk's request to do him "a favor," Mr. Joseph agreed to smuggle contraband, believed to be a cell phone and marijuana, into the prison and deliver it to Inmate-1. Mr. Joseph admitted that he spoke on several occasions with Individual-1, Inmate-1's outside contact, for the purpose of receiving a $12,000 payment, not for contraband already delivered to Inmate-1, but for payment to deliver contraband after the payment was received. The payment was never received. Furthermore, the Government will acknowledge that Individual-1 never met Mr. Joseph, and neither personally delivered any money to my client nor sent money to Mr. Joseph on a cash application. The text messages between Individual-1 and Mr. Joseph, between January 25, 2021, and January 30, 2021, discuss only the

delivery of the money to Mr. Joseph and my client's need to speak with Inmate-1 "before anything else," a comment we submit refers to the delivery of the contraband after Mr. Joseph received the $12,000. The money was never paid, and the transaction was never completed. Mr. Joseph never delivered contraband to Inmate-1.[2]

Mr. Joseph pled guilty to Count 4 of the Indictment relating to his relationship with Inmate-3 between January 2021 and November 2021, and further acknowledges bringing in contraband, cell phones, marijuana, and personal items, such as sunglasses, for Inmate-3. The PSR Addendum accurately described the relationship between my client and Inmate-3. (See. PSR Addendum ¶ 8a).

4. **History and Characteristics of the Defendant.**

The attorney for Jeremy Monk pointed out in her sentence memorandum that "[t]he Supreme Court has repeatedly affirmed a federal judge's ability to grant a variance from the Guideline range based on the§ 3553(a) factors," citing *Beckles v. United States*, 137 S. Ct. 886, 892 (2017), and, also noted that "[t]he Court has also made clear that granting a variance does not require a showing of extraordinary or special circumstances. To the contrary, 'courts are entitled to vary from the . . . guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range," citing *Spears v. United States* , 555 U.S. 261,267 (2009). (See, page 4 of Document 20 filed in *United States v. Jeremy Monk*, Criminal Docket No. 22-442 (FB), Eastern District of New York, attached as **Exhibit 6**). Mr. Joseph's devotion to his family, his exemplary work record, his good character as

---

[2] The text messages appear in the Government discovery document bate-stamped 001010. It is extremely difficult to read the relevant text messages between Individual-1 and my client in this original document, and also identifies Individual-1, ███████████████ by name and telephone number. We have extracted the relevant text messages from the Government's discovery document, and presented them in **Exhibit 4** without the parties' telephone numbers and using the defendant's last name "Joseph" and Individual-1 for the participants in the text messages. The Government discovery document, with all the text messages identifying the parties and providing their telephone numbers, is marked as **Exhibit 5** and submitted to the Court under seal. The only coded words needing interpretation are "Grown," which is a name used by Inmate-1, and "12 bands" referencing $12,000.

revealed in the letters from family and friends, his commitment to rehabilitation, and his "compli[ance] with all Court-ordered conditions of release," as reported by Pre-Trial Service and noted in PSR ¶ 4, all support our recommendation that a time-served sentence with a period of home confinement and community service is sufficient to satisfy the goals and purposes of sentence.

Mr. Joseph is 34 years old, is a first-time offender without any criminal record. He comes from a very supportive family, including his father, mother, stepfather, and siblings. (See, PSR ¶¶ 56-59). His mother Gladys Bruce described her son "as an honest, hardworking, family-oriented person and an attentive and doting father." (See, PSR ¶ 57). Except when he "was receiving chemotherapy treatments" for cancer from May 2013 to July 2014, Mr. Joseph displayed an exceptional work record, employed as a retail worker with Toys R Us (October 2009 until January 2010), a security officer with Securities USA, Inc. (October 2010 until May 2013 when he was diagnosed with cancer), a postal carrier with the U.S. Postal Services (July 2014 to March 2015), a transportation security officer for the Transportation Security Administration (TSA) at JFK International Airport (June 2015 until May 2020), and a correction officer for the BOP at the MDC (May 20, 2020 until his arrest on April 18, 2023). (See, PSR ¶¶ 69-75).

Mr. Joseph's dedication to his family is his primary consideration in all his decisions, including his accepting responsibility for his conduct, his rehabilitation, and his remorse for his actions that have adversely affected his obligations to his family, especially his son who requires "necessary services" to treat his speech deficiencies diagnosed as a form of autism.[3] Mr. Joseph describes the disorder as "delayed speech" requiring speech therapy and treatment.

---

[3] Autism spectrum disorder includes communications problems in children and has been described as "a developmental disability that can cause significant social, communication, and behavioral

As mentioned earlier, Mr. Joseph and his girlfriend Ms. Frazier, a retired military service veteran, lived together from 2014 until 2020, with their two children, his stepdaughter Amani Ritter (age 12), who he has raised with her mother since she was 3 years old, and son King Joseph (age 7).

Mr. Joseph's girlfriend decided to move to Atlanta, Georgia, because the cost of living was more favorable and they believed it would be "better" for the children, family members lived in the Atlanta area, and his girlfriend applied for and was hired as a drug treatment specialist ████. ████████████████████████████████████████████. As planned, after completing his 12-month probationary period as a correction officer at the MDC, Mr. Joseph

---

challenges. The term "spectrum" refers to the wide range of symptoms, skills, and levels of impairment that people with ASD can have. ASD affects people in different ways and can range from mild to severe. People with ASD share some symptoms, such as difficulties with social interaction, but there are differences in when the symptoms start, how severe they are, the number of symptoms, and whether other problems are present. The symptoms and their severity can change over time. The behavioral signs of ASD often appear early in development. Many children show symptoms by 12 months to 18 months of age or earlier." *https://www.nided.nih.gov/health/autism-spectrum-disorder-communication-problems-children#:~:text=Some%20children%20with%20ASD%20may,rhythm%20of%20words%20and%20%20sentences*.

"Children with ASD may have difficulty developing language skills and understanding what others say to them. They also often have difficulty communicating nonverbally, such as through hand gestures, eye contact, and facial expressions.

The ability of children with ASD to communicate and use language depends on their intellectual and social development. Some children with ASD may not be able to communicate using speech or language, and some may have very limited speaking skills. Others may have rich vocabularies and be able to talk about specific subjects in great detail. Many have problems with the meaning and rhythm of words and sentences. They also may be unable to understand body language and the meanings of different vocal tones. Taken together, these difficulties affect the ability of children with ASD to interact with others, especially people their own age." *Id.*

applied for a transfer ███████████, but was denied for some unknown reason, possibly because of the ongoing investigation that led to his arrest on April 18, 2023. Because of his arrest and current circumstances, Mr. Joseph and his girlfriend have postponed their wedding plans for the immediate future.

Ms. Frazier, in her letter to the Court, wrote,

Quandelle has always displayed qualities of honesty, loyalty and always takes responsibility for his actions. He is a great parent to both of our kids and a positive mentor in my life. He always stays positive in situations where the outcome may be against him. He always manages to figure it out and find the bright side of things . . .

... I have watched him grow into a great man whom I intend to marry one day. Every relationship has its ups and downs, and I can honestly say that when wrong he will admit and figure out how to change and make the situation better, which has taught me to learn to do the same.

(See, Tanasia Frazier Letter attached as **Exhibit 7**).

After his family moved to Atlanta and before his arrest on April 18, 2023, Mr. Joseph lived with his sister in Kiara V. Joseph in Brooklyn and would travel as often as possible to be with his family in Atlanta, depending on his work assignments, usually on weekends averaging a week to a week and a half every month, and on vacations and when necessary.

Significantly, after terminating his relationship with Inmate-3, Mr. Joseph voluntarily choose to change his life, and for more than a year before he was arrested April 18, 2023, he refused to participate in any other unlawful activities. The separation from his family, especially his son, whom he would try to speak with by telephone or video conference every day, was emotionally taxing, and became even more so after his arrest and loss of employment.

Life has become an emotional and financial challenge, with the loss of his job and the yearly income of $80,000 from the BOP, and separation from his family. Being a hard-working

and dedicated father, Mr. Joseph has attempted to secure meaningful employment but the arrest and pending criminal case has prevented him from doing so.

Around September 2023, he applied for a position as a behavioral health specialist at Brooklyn Health and Hospital ("Brooklyn Hospital") but was turned down because his criminal case was still "open." In early 2024, he was contacted by the New York City Metropolitan Transit Authority to begin a six-month training program to become a "train operator" after passing the required examination many years earlier. However, after disclosing his "open" criminal case, he was advised to contact the NYC Transit Authorities Human Resources Department when he obtains a disposition of the case, without any assurances of being hired at that time. Mr. Joseph had also applied for and was called for two other positions with the NYC Transit Authority, bus operator and train conductor, but received the same response.

On June 30, 2024, Mr. Joseph received confirmation that he also past the test to become a "Block Operator" trainee that oversees the daily train operations and was eligible for the next training sessions to be held in August 2024 and again in September 2024. Mr. Joseph is hopeful that, if he receives a non-custodial sentence, he will be considered for the positions with the NYC Transit Authority because, under its hiring practices, the agency will offer a job to convicted felons.[4]

Since his arrest, Mr. Joseph has exhausted also his savings, including money from his Thrift Savings Plan, to meet his daily needs and his family responsibilities, and has been "financially supported by his partner and family members." (See, PSR ¶ 68). Since January 2024, he has been

---

[4] "MTA will not impermissibly use or rely on immigration/alienage/citizenship status, weight, height, credit history, arrest/conviction records, unemployment history, or salary history in its employment practices." See, https://new.mta.info/careers/eeo#:~:text=In%20addition%2C%20MTA%20will%20not,history%20in%20its%20employment%20practices.

working as an Uber driver earning approximately $300 per week, living from paycheck to paycheck.[5]

### 5. Character Letters.

Attached to the defendant's sentence submission are character letters from Mr. Joseph's family and friends that speak of his good character, his dedication to his family, his outstanding work ethic, and commitment to rehabilitation.

**Willie Andrews: Longtime friend**

Willie Andrews went to high school with Quandelle. They have known each other for over 20 years. Both Willie and Quandelle graduated with honors. The two played sports together, started their first jobs together, and are as close as brothers. Willie would like the Court to know, how over the years, Quandelle displayed leadership skills and was known for setting positive examples and guiding his friends in the right direction. Willie sees Quandelle as a great father to his son and stepdaughter. Quandelle has shown Willie what it is to be a great father and is the uncle and godfather to his children. Willie speaks very highly of Quandelle writing,

> In the years I have known Quandelle, he has consistently demonstrated resilience and strength. In the mid-2010s, I watched my friend fight for his life, overcoming cancer and restoring himself to great health and strength. This experience proves to me that he has a purpose on this earth…whether it's inspiring kids in similar health situations or showing men like me what it takes to be a great dad and the man of the family.

(See, Willie Andrews Letter attached as **Exhibit 9**).

**Clifford Joseph – Father**

Clifford Joseph is Quandelle's father. He would like the Court to know that Quandelle has a "long history of devotion to his family and for the care of his son King." Clifford explains that

---

[5] Attached as **Exhibit 8** are Mr. Joseph's monthly Uber statements from January 2024 to the present reflecting his income from the company.

Quandelle has a history of being a hardworking, reliable, and caring person. He is always willing to go above and beyond to help others. "He also demonstrates consistent qualities of honesty, responsibility and accountability." He writes,

> I understand the gravity of the situation before the court and respect the legal process. However, I firmly believe that my son is more than the sum of his actions that led to this moment. Quandelle's character and contributions are testaments to the kind of person he truly is one who is capable of learning from mistakes and making positive changes.

(See, Clifford Joseph Letter attached as **Exhibit 10**).

**Toya King-John – Father of Tanisha Frazier**

Toya King-John is a retired US Army veteran with 23 years of service. He retired from the Department of Defense Federal civilian service as a Human Resources Specialist with 18 years of service. Toya writes in support of Quandelle. He has known Quandelle for 10 years and explains that Quandelle is an outstanding father to his grandson and a wonderful caregiver to his granddaughter. "He has shown himself to be generous, kind and has a great sense of duty that has always been shown to me and my family members." Toya goes on to describe Quandelle as "always seeking self-improvement…His work ethics has always shown him to be an asset to any team…He is reliable, responsible, and always willing to go above and beyond when opportunities came."

(See, Toya King-John Letter attached as **Exhibit 11**).

**Kiara V. Joseph – Sister**

Kiara Joseph has written to the Court regarding her brother Quandelle. She is aware of his current legal situation and fully supports him. She would like the Court to see Quandelle in "another light beyond the confines of the court." She considers her brother to be her protector, best friend, and life coach. "I admire him for overcoming the worst hardships anyone could go through…advancing in his career to becoming a better person and a devoted father…" Quandelle

has been living with his sister for a couple of years. She has a firsthand view of the personal progress and positive impact Quandelle has had on her daughter's life. She quotes Quandell during the time he had cancer as saying, "Kiki, sometimes you just have to let it go and let things take their course." She has taken this to heart throughout her life. She further writes,

> His unwavering work ethic, demonstrated through his past jobs is unmatched. Quandelle is a loving father, uncle, and brother, and he is truly the light of our lives. He is the glue that holds our family together...

(See, Kiara V. Joseph Letter attached as **Exhibit 12**).

### Roshane Hutchinson – Friend and Professional Peer

Roshane Hutchinson currently works as a United States Customs Officer. She is both a friend and also worked with Quandelle as a correction officer while at the MDC. She has known Quandelle for approximately 10 years. She describes Quandelle as having unwavering dedication, a strong work ethic, and commitment to excellence. She goes on to say, "...Quandelle consistently demonstrates a remarkable level of determination and perseverance that is truly admirable." He displays certain admirable qualities, for example he consistently demonstrates a remarkable level of determination and perseverance.

> In the workplace, Quandelle is a reliable and invaluable team member. His strong work ethic, attention to detail, and ability to collaborate effectively makes him an asset to any project or team. He is proactive, resourceful, and always willing to take on new challenges with enthusiasm and a positive attitude.

(See, Roshane Hutchinson Letter attached as **Exhibit 13**).

### Jerrell Richards – Friend and Corrections Officer

Jerrell Richards has known Quandelle for five years. Jerrell is a Maryland State trooper and good friend. He met Quandelle while working as a corrections officer. Over the past five years they have become very close, and he considers Quandelle a brother. For the entire time he has known Quandelle he has never questioned his loyalty, friendship, value, or mentorship to his community and family. He has a very high opinion of Quandelle and considers Quandelle a "stand-

up man." After Jerrell stopped working as a corrections officer their friendship continued to grow. Quandelle was always there for him as a friend and mentor. In his letter to the Court Jerrell says, "Mistakes are a learning part of life…I believe this makes Quandelle an even better man because he has realized his mistake, owned up to it, and continues to learn from it, striving daily to make better decisions."

(See, Jerrell Richards Letter attached as **Exhibit 14**).

### Saevonne Campbell – Peer and Friend

Saevonne Campbell is currently a federal employee with the Department of Homeland Security. She met Quandelle about six years ago. "In the years that I have known him, I can attest to his incredible character, kindness, and respectfulness. He consistently goes above and beyond for the people he loves…anyone who knows him can attest to his unwavering loyalty and love for other, often putting their needs before his own." She describes Quandelle as an honest and hardworking man. Quandelle is Saevonne's daughter's Godfather. Saevonne is aware of the charges he is currently facing and continues to support him.

(See, Saevonne Campbell Letter attached as **Exhibit 15**).

### Shamequa Moore – Friend

Shamequa Moore has been a friend of Quandelle's for the past three years. She considers him a true family man and dedicated father. He was there for Shamequa during the time her father was ill with cancer. He showed Shamequa continued support during a very stressful time in her life. Shamequa feels that during this rough patch in his life, Quandelle has shown great strength and continues to maintain a positive outlook. Even while dealing with his own problems, he continues to help others.

(See, Shamequa Morre Letter attached as **Exhibit 16**).

### Quinnell Paige – friend and co-worker

Quinnell Paige works for the Department of Homeland Security Transportation Officer (TSA). Quinnell and Quandelle started out as co-workers approximately seven years ago as TSA officers. During this time they have become close friends. He considers Quandelle to be a hard worker, as well as a reliable and caring person.

(See, Quinnell Paige Letter attached as **Exhibit 17**).

### Jamal Ross – Friend and Co-worker

Jamal Ross and Quandelle were both correction officers at the MDC and then became good friends. He considers Quandelle a person of admirable morale character. Although, Jamal is "fully aware of the seriousness of the case before him," he still feels that Quandelle has "consistently demonstrated qualities of trustworthiness, dependability, and selflessness." He writes,

> I firmly believe that the quality of one's life is a direct reflection of the choices we make, and Quandelle is determined to make the right choices moving forward. He has expressed deep remorse and a strong commitment to making amends for his actions, ensuring such a situation never occurs again.

(See, Jamal Ross Letter attached as **Exhibit 18**).

### Anisa Telesford Sponsper – TSA Supervisor

Anisa has known Quandelle since 2015. While Quandelle worked as a TSA Officer, Anisa was his TSA Supervisor. She found Quandelle to be supportive, responsive, and hardworking. During their time together with the TSA, he was a diligent professional and received model officer recognition awards.

(See, Anisa Telesford Letter attached as **Exhibit 19**).

### Rashawn Gilchrist – Friend and Neighbor

Rashawn Gilchrist has been friends with Quandelle for over 30 years. They consider each other family. Rashawn would like the Court to know that Quandelle has a positive outlook and approaches life with a kind heart. Not only is Quandelle a good neighbor, he is always willing to

help friends and family. Rashawn feels that Quandelle's selflessness is a true testament to his character. Rashawn finds Quandelle to be reliable and hardworking. He writes,

> In all the years I have known Quandelle, his dedication to his loved ones, his integrity, honesty, and compassion has made him not only a great friend but also an exemplary person. I am confident that anyone who knows him would agree that he enriches the lives of those fortunate enough to be in his presence.

(See, Rashawn Gilchrist Letter attached as **Exhibit 20**).

**Angela Lawson – Friend and Co-worker**

Angela Lawson is a very good friend of Quandelle and considers him a brother. In regard to Quandelle, she cannot stress enough how "...dependable, reliable, understanding, courteous, a god fearing man as well as stand-up citizen!" Angela and Quandelle first met and worked together at TSA. Quandelle was an excellent employee and took his job very seriously. Quandelle would look out for Angela during the workday, especially if she needed a ride home. He was a very good friend. They have become so close that they consider each other family. He has become an "uncle" to Angela's two sons. Angela is very fond of Quandelle and considers him family.

(See, Angela Lawson Letter attached as **Exhibit 21**).

   6. **Disparity in Sentencing.**

In determining a fair and reasonable sentence, courts are required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." (See, 18 U.S.C. §3553(a)(6)). We respectfully ask the Court to consider the sentence of Jeremy Monk, sentenced by the Honorable Frederic Block, U.S. District Court Judge, Eastern District of New York, on December 6, 2023, to a one-year term of probation, with three months home confinement, and 50 hours of community service, in determining an appropriate non-guideline sentence for Mr. Joseph. (See, Judgment in A Criminal Case filed as Document 23 in Criminal Docket No. 22-442(FB) and attached as **Exhibit 2**).

At the outset, we recognize that each defendant appears before the Court with many differences in both their roles in the criminal offense and in their personal characteristics. However, in our case, substantial similarities appear pertinent to our analysis and for the Court's consideration.

Jeremy Monk and Mr. Joseph both began working at the MDC in May 2020, each are non-violent, first-time offenders, without any criminal records, and both are hard-working fathers dedicated to raising their children. Though the guideline range for Mr. Monk was 24-30 months, compared to 30-37 months for Mr. Joseph, each are responsible, according to the Government, of "accept[ing] bribes on multiple occasions in exchange for smuggling contraband into the MDC." Were the government to have used a bribe amount of $15,000 or more for Jeremy Monk, instead of an amount of $6,500 or more, the resulting guideline levels for each defendant would have been the same, 30-37 months.

Additionally, Jeremy Monk never voluntarily ceased smuggling contraband into the prison, instead resigned from his position as a correction officer three days after being placed on low security after smuggling marijuana into the MDC for $10,000 on April 15, 2022, advising the BOP that he was resigning because of "some stupid investigation." (See, ¶¶ 9-11 of Criminal Complaint filed as Document 1 in Magistrate Complaint No. 22-805 (PK) attached as **Exhibit 22**).

Considering the need to avoid unwarranted sentence disparities and the other pertinent 3553(a) factors previously discussed, we submit that an appropriate and fair sentence for Mr. Joseph would be a non-custodial sentence similar to the sentence imposed by Judge Frederic Block on Jeremy Monk.

7. **Quandelle Joseph's Letter to the Court**.

In a letter to the Court, Mr. Joseph accepts responsibility for his actions, expresses his sincere remorse, discloses his commitment to rehabilitation, and mentions the harm caused to his family and community by his conduct. I attempted to summarize my client's letter, but to do so would remove the genuineness and sincerity you feel when reading his words. With the Court's indulgence, I am writing verbatim Mr. Joseph's letter to the Court:

> I hope this letter finds you in good health. My name is Quandelle Joseph, and I am writing to you regarding my case currently before your court. I deeply regret the actions that have brought me before you and your court and fully understand the gravity of my offenses. I am writing to humbly request leniency in the sentencing you may impose.
>
> Firstly, I wish to express my sincere remorse for my actions. I understand the negative impact they have had not only on myself but also on others, including my family and the community. I take full responsibility for my conduct and am committed to making amends.
>
> Since the incident, I have taken several steps to rehabilitate myself and ensure such behavior is never repeated. These steps include mentoring peers and youth, as well as seeking counsel from peers to manage the missed job opportunities at federal and city level due to my actions. These efforts have provided me with valuable insights and significantly contributed to my personal growth and understanding of the consequences of my actions.
>
> I am also a one of the primary caregivers for my children and family. My absence would cause significant hardship for them, especially during this challenging time. I am currently unable to access the necessary services for my son, as they all depend on my presence and caregiving for our family's well-being. While I understand my actions have contributed to this situation, I humbly request you consider the impact a severe sentence would have on my family.
>
> Additionally, I have strong support from both my family and community, who believe in my capacity for change and are committed to assisting me in reintegrating back into society as a responsible individual. In light of my genuine remorse, efforts toward rehabilitation, and the support system I have in place, I respectfully request your consideration for a sentence of leniency. I am willing to comply with any conditions you deem necessary, such as continued counseling, community service, or probation.

Thank you for taking the time to read my letter and consider my request. Regardless of the outcome, I am determined to continue on a path of personal growth and become a contributing member of society.

(See, Quandelle Joseph Letter attached as **Exhibit 23**).

8. **Recommendation – Time Served and Supervised Release is a Fair and Just Punishment after Considering all the 3553(a) Factors.**

Based on a consideration of all the 3553(a) factors, we respectfully submit that a time served sentence followed by a term of supervised release is a fair and just punishment, sufficient, but not greater than necessary to satisfy the goals of sentencing.

In <u>Gall v. United States</u>, 552 U.S. 38 (2007) the defendant was involved in an ecstasy distribution ring. Facing a guideline range of 30-37 months, the District Court sentenced him to three years' probation based upon his withdrawal from the conspiracy and his post-offense conduct. The Supreme Court agreed with "the District Court's conclusion that Gall is not going to return to criminal behavior and was not a danger to society," and, based upon those factors, the Supreme Court held that probation was a reasonable sentence. <u>Gall v. United States</u>, 552 U.S. at 56-57.

Even before his arrest, Mr. Joseph chose to turn his life around, demonstrating a commitment to rehabilitation which provides proof (1) that he is not a danger to society and (2) that the chances of him returning to criminal behavior are minimal to non-existent.

The only reason to impose a jail sentence would be for punishment, for acts that were committed over three years ago, and committed by a far different person than appears before this Court now. While we fully understand that punishment may be a permissible reason to impose incarceration, we respectfully submit that incarceration is not warranted in this case, based upon Mr. Joseph's dedication to his family, his being a first-time offender, and his commitment to rehabilitation.

As the Court stated in Gall, probation supervision does amount to substantial restrictions on individual freedom and if we can structure a supervised release sentence that meets all the purposes of sentencing, time served and supervised release is entirely appropriate:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See, United States v. Knights, 534 U. S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'"(quoting Griffin v. Wisconsin, 483 U. S. 868, 874 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

Gall v. United States, 552 U.S. at 48.

In commenting on the Gall decision, Judge John Gleeson noted in the case of United States v. Leitch that

> [W]hen a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment. And as the Supreme Court has recognized, probation is *significant* punishment . . . In addition to standard and special conditions [of probation], there is an array of alternative sanctions – home confinement, community service, and fines, for example – that allow judges to impose enhanced (and sometimes consecutive) punishment without sending the defendant to prison.

United States v. Leitch, 11-CR-609, 2013 WL 753445 at 12 (E.D.N.Y. February 28, 2013).

Similarly, we submit that Mr. Joseph's pre and post-arrest rehabilitative conduct, along with a consideration of his outstanding character, demonstrated by the letters from family and friends, "leads strong support to the conclusion that imprisonment [is] not necessary to deter [Mr. Joseph] from engaging in future criminal conduct or to protect the public from his future criminal acts." Gall v. United States, 552 U.S. at 59.

Moreover, Mr. Joseph has not escaped punishment for his transgressions. His family has suffered by his criminal conduct, especially his relationship with his son, he has been unable to secure meaningful employment, has had to use his life's savings to support himself after his arrest, and, as the Second Circuit noted, "the need for deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." See, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

**Non-Custodial Term Fair and Reasonable Under all the Circumstances.**

As I was writing the sentence memorandum, I recalled a quote from a state court judge and felt it was an appropriate consideration for this Court:

> Sentencing is one of the most difficult problems that confronts a judge of a criminal court. After guilt has been established or acknowledged, when to be severe, when to be merciful, when to impose no sentence at all can cause many uneasy moments for the conscientious judge.
>
> Basically, the primary object of our penal philosophy must be the protection and security of our community. For reasons of simply safety, the habitual criminal with his anti-social orientation and the incorrigible thug who resorts to violence to achieve his criminal designs must be uprooted and separated from the community. As a consequence, not only is protection afforded society but, rightly or wrongly, the law assumes that prompt and substantial punishment in such cases will deter others similarly inclined.
>
> However, all offenders are not habitual criminals. Great care should therefore be exercised in imposing judgment for the very obvious reason that vast differences exist among individual offenders and their personal capacity for rehabilitation.
>
> The prime aim of socialized justice, and inherent in its administration in our criminal courts today, is a dispassionate and conscientious evaluation of the unique aspects of the convicted offender's total personality, his intelligence, his character structure, his demonstrated ability to conform, his capacity to accept our social disciplines and limits, and his over-all stability. Such an inventory of his assets and liabilities is indispensable to a judicial determination in selected cases of whether accidental or situational offenders with promising potential can be aided to readjust to a normal life in the community without the disruptive, and sometimes destructive, effects of imprisonment.
>
> In sum, a sentence must not only encompass the community's condemnation of the defendant's misconduct but must also evaluate the possibilities of the rehabilitation of the defendant as a useful and responsible member of the community. The point need not be

labored that it is, generally, the community's gain whenever a family can be kept together as an integral and emotionally satisfying unit, with the head of the family meeting his responsibilities to it instead of unnecessarily marking time in jail.

People v. Silver, 10 A.D.2d 274, 275-277 (1st Dept. 1960).

**Home Confinement as a Substitute for Imprisonment.**

In the event the Court determines that a custodial sentence is necessary, we respectfully ask that you consider sentencing Mr. Joseph to time served followed by a period of supervised release with a condition of home confinement for a reasonable period as an authorized substitute to incarceration. See, *United States v. Lopez-Pastrana*, 889 F.3d 13, 18-19 (1st Cir. 2018)("Home confinement is treated as a form of 'custody' under federal law . . . Moreover, the Guidelines and federal statutes allow home confinement only as a substitute for incarceration . . . Put simply, home confinement is a 'unique' condition of release, permissible only as a stand-in for imprisonment.")(Citations omitted).

**Conclusion.**

We respectfully submit that a sentence of time served and supervised release is sufficient, but not greater than necessary, to ensure that the sentence (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) afford adequate [general] deterrence to future criminal conduct; and (3) protect the public from further crimes of the defendant [specific deterrence].

Based upon the above, we respectfully submit that a sentence below the recommended guideline range of time-served and supervised release is a fair and just punishment under all the circumstances.

Thank you very much for your consideration of our submission.

Respectfully submitted,

Robert P. LaRusso

cc:     Clerk of the Court
        (by email)

        Philip Pilmer
        Assistant U.S. Attorney
        Eastern District of New York
        (by ecf and email to philip.pilmer@usdoj.gov)

        Gregory Giblin
        U.S. Probation Officer
        Eastern District of New York
        (by email to gregory.giblin@nyep.uscourts.gov)